```
 1                UNITED STATES DISTRICT COURT
                     DISTRICT OF CONNECTICUT
 2

 3  _____ )
    UNITED STATES OF AMERICA,     ) No. 3:11-cr-00213-SRU-1
 4                                )
                      Plaintiff,  ) February 10, 2025
 5  v.                            )
                                  ) 10:13 a.m.
 6  WILLIAM SCOTT VAN WYK,        )
                                  ) 915 Lafayette Boulevard
 7                   Defendant.   ) Bridgeport, Connecticut
    _____)
 8

 9     FINAL HEARING RE REVOCATION OF SUPERVISED RELEASE

10  B E F O R E:

11          THE HONORABLE STEFAN R. UNDERHILL, U.S.D.J.

12

    A P P E A R A N C E S:
13

14  FOR THE GOVERNMENT:

          OFFICES OF THE UNITED STATES ATTORNEY
15        U.S. DEPARTMENT OF JUSTICE
              157 Church Street, 25th Floor
16            New Haven, CT 06510
              203-821-3767
17            Email: angel.krull@usdoj.gov
          BY:  ANGEL KRULL, AUSA
18

19  FOR THE DEFENDANT:

20        OFFICE OF FEDERAL PUBLIC DEFENDER
              10 Columbus Boulevard, 6th Floor
21            Hartford, CT 06106-1976
              (860) 493-6260
22            E-mail: anne_silver@fd.org
          BY:  ANNE SILVER, AFD
23

24

              Official Court Reporter:
25            Melissa J. Cianciullo, RDR, CRR, CRC
              (203) 606-1794
```

1          (CALL TO ORDER, 10:13 a.m.)

2          THE COURT:  Good morning.  We're here for the

3     continued revocation hearing in the matter of the

4     *United States v. William Van Wyk.*

5          Could I have appearances, please.

6          MS. KRULL:  Good morning, Your Honor.  Angel

7     Krull on behalf of the people of United States.

8          THE COURT:  Thank you.

9          THE PROBATION OFFICER:  Good morning, Your

10    Honor.  Kim Gorton from the United States Probation

11    Office.

12         THE COURT:  Thank you.

13         MS. SILVER:  Good morning.  Anne Silver from

14    the Federal Defender's Office on behalf of

15    Mr. Van Wyk who is seated with me here at counsel

16    table.

17         THE COURT:  Very good.  All right.  Well, I

18    think we postponed this to allow the government to

19    submit a sentencing memorandum.  They have done that,

20    I've reviewed it, and I'm happy to hear from both

21    sides.

22         Ms. Silver, do you want to begin?

23         MS. SILVER:  Yes.  And I assume that we will

24    take up sentencing and then the proposed amendments

25    to the conditions, or do you want me to address those

1 all together?

2    THE COURT:  Well, my thought is this:  We may

3 want to have a separate hearing on the question of

4 conditions of supervised release, that is, a

5 modification hearing, regardless of what happens

6 today.  You'll then have an opportunity to submit

7 something in writing which really you haven't done

8 yet, understandably haven't done yet.

9    MS. SILVER:  That's fine.  The only thing I

10 want to note for the Court is that Mr. Van Wyk will

11 have transportation problems once he's released from

12 prison.  So I don't want to forestall the need for a

13 revocation hearing, but I do just want to acknowledge

14 -- or the modification hearing.  I just want to

15 acknowledge the realities here that it is going to be

16 very difficult for him to get to Bridgeport, although

17 maybe we could do this at a reasonably soon date.

18    I think -- there are only a few things that I

19 think we would have significant disputes over.  Most

20 of the conditions that are being proposed are

21 duplicative or in line with what's already in his

22 conditions.  There is a few that I can highlight for

23 Your Honor if you want to address them now.

24    THE COURT:  Well, let's take up sentencing

25 first and then we'll see.

          MS. SILVER:  Understood.

          Okay.  So, you know, we filed our memorandum
that sort of sets out what Mr. Van Wyk was trying to
do when he was released from prison.  I don't think
it's any secret that he has a long road to go in
terms of rehabilitation, reintegrating into society.
And there were steps that he was taking to sort of
get his life back on track.

          He was -- he does have a productive
relationship with Community Partners in Action which
is a reentry center in Hartford.  He has been working
with one of their counselors.

          He was frustrated by his lack of progress,
the lack of immediate progress in terms of getting
identification, getting a job.  It wasn't an easy
transition for him.  But he knows that it's going to
be a long road, that he is trying to reenter society
after being in prison for more than 15 years, I
think, in terms of actual incarceration time, and
that he needs to use the resources of Community
Partners in Action, of his probation officer in order
to assist him in that transition.

          I don't see what purpose reincarceration for
an additional four months will do in this case.  He's
just going to come out in four months, be in the

exact same position that he's in.  I don't think it

will serve any rehabilitative purpose.  He's already

gotten the benefit of that -- the purpose that prison

could -- whatever purpose that prison would have for

him, whatever benefit, he's already gotten that

benefit.

He's been able to use the resources of the

Department of Corrections.  It's the first time in

his life, actually, that he's had access to podcasts

which are a medium that he finds particularly helpful

as opposed to books.  In the BOP, he could not afford

a tablet.  And he's been really invested in trying to

engage in motivational material and material that's

going to help him commit to that journey going

forward.

THE COURT:  All right.  Thank you.

Mr. Van Wyk, you have the right to be heard

today if you wish to say anything.  You don't have to

and you can rely on your lawyer's arguments, if you

prefer.

THE DEFENDANT:  Okay.  Thank you, sir.

THE COURT:  Is that what you'd like to do

or --

THE DEFENDANT:  Sure.

Like Ms. Silver has said, I have listened to

1   tons of podcasts, motivational, inspirational

2   podcasts.  Dr. Joe Dispenza is -- actually, I'm a big

3   fan of his now.

4          And, you know, I'm working towards being the

5   person I'm supposed to be and, you know, changing my

6   life.  Like she said, it's going to be a long road; I

7   know that.  But I'm dedicated to, you know, going

8   down that road and working every day to try to be a

9   better person.

10          THE COURT:  Very good.  Thank you.

11          Ms. Krull.

12          MS. KRULL:  Thank you, Your Honor.

13          I did submit a very detailed sentencing

14   memorandum, so I don't have a whole lot to add today,

15   although I do want to emphasize that in addition to

16   rehabilitation being a purpose of supervised release,

17   protecting the public is also one of those purposes.

18   And given the defendant's history which I've laid out

19   in detail and the recent conduct both at the

20   Drapelick Center and his recent conviction are huge

21   red flags, you know, a danger sign that we should

22   listen to.  And so that is why I'm supporting the

23   probation officer's recommendation, in order to

24   protect the public, because he was only on supervised

25   release for less than two months when all of this

1    happened.  And he's saying that he wasn't -- he was

2    frustrated with the lack of progress.  It was, I

3    think, approximately six weeks.  And so that's --

4    that kind of rings hallow if it was such a short

5    period of time.  It's another red flag that during

6    such a short period of time, he was already

7    frustrated with the process of working with

8    supervised release to work on his plan.

9            So I'm only here to emphasize the danger to

10   the community and that protecting the public is a

11   very important part of supervised release.  And also

12   with the supervised release conditions that I know we

13   can get into, but that is also the reason why the

14   government is proposing such strict conditions.  It's

15   all about protecting the public from someone who has

16   shown repeatedly that he is a danger to the public.

17           THE COURT:  All right.  Thank you.

18           Ms. Gorton, did you want to say anything?

19           THE PROBATION OFFICER:  Yes, Your Honor.

20           I stand by the recommendations in our

21   sentencing recommendation.  Mr. Van Wyk was on

22   supervision for a very short period of time.  He was

23   subject to regular, weekly in-person contacts with

24   the probation office.  We referred him to the

25   services that we had hoped would be helpful to him.

He attended them.  Thankfully, he attended

sex-offense-specific treatment when referred.

He also was working regularly on getting a

job.  He was communicating with me.  We had invested

as much as we possibly could with Mr. Van Wyk as far

as paying for his rent, financially providing a cell

phone, as well as some other basic needs that he

needed when he relayed.  So we were invested in his

success, and it's unfortunate we're here today.

This is a Grade C violation.  Our office did

recommend a term of incarceration, and that is in

part because this conduct was brought to the

attention of the police department because a mother

was concerned and concerned that on more than one

occasion, you know, Mr. Van Wyk had participated in

behavior that was concerning to her.

If this had been some other sort of issue,

you know, our office would have happily worked with

him.  We will continue our recommendation of

supervision going forward as well.  We'll continue to

work with him on things when he is challenged.  But

when it results in the concern for safety of a mother

and children in the community, our office does see

the importance of recommending incarceration.

THE COURT:  Did you have a chance to speak

with the mother?

       THE PROBATION OFFICER:  I didn't, Your Honor.

       THE COURT:  Okay.  Is there any reason to believe that Mr. Van Wyk was aware that a mother with young children lived at the house where he dropped the underwear?

       THE PROBATION OFFICER:  I didn't see anything in the reports, Your Honor.

       THE COURT:  Ms. Silver, anything further?

       MS. SILVER:  I would just note that I believe that the state investigation revealed that there is no evidence that he was aware of that, which is why stalking charges were not pursued by the state.

       THE COURT:  All right.  Well, Mr. Van Wyk, I have to consider the factors in 18 U.S.C. Section 3553(a), other than punishment, when deciding how to deal with this situation.

       I will note that the two principal purposes of supervised release are rehabilitation and protection of the public.  There is a question in my mind how best to protect the public in a circumstance such as yours, whether locking you up will protect the public long term or only for the period that you're incarcerated, whereas rehabilitation, theoretically, could protect the public for a much

1   longer period of time.

2          I would note a couple of things also about

3   the charged violation.  The conduct you were

4   prosecuted for was breach of the peace in the second

5   degree.  That's a Class B misdemeanor with a maximum

6   sentence in state court of six months.  You received

7   the maximum sentence in state court.  That raises the

8   question whether additional punishment is necessary

9   in the federal court.

10         Interestingly, the breach of peace second can

11  be committed by somebody who fights, assaults or

12  strikes another, threatens to commit any crime

13  against another person, publicly exhibits indecent or

14  abusive material, uses obscene or abusive language in

15  a public place or creates a public and hazardous

16  physical -- physically offensive condition.

17         In my view, dropping underwear on somebody's

18  front lawn is a bad thing to do.  It is obviously

19  criminal in state law.  It's not criminal in federal

20  law.  And the question arises whether you need

21  additional incarceration.  The sentencing guidelines

22  in Chapter 7 have a series, not of guidelines but of

23  policy statements.  Those policy statements suggest,

24  as has been noted, that you serve at least four

25  months in prison for this violation.

1    I see this violation as misguided,

2  unfortunate, but not especially serious.  It was --

3  it's clear you have a serious problem.  It's clear

4  you need to deal with that serious problem, and it's

5  clear that should you do anything with respect to

6  direct connection with a child, you're going to face

7  extremely serious consequences.

8    You have a sickness or addiction.  I mean, I

9  don't know how to describe it.  And I think you need

10 to, like a drug addict would, you need to figure out

11 what triggers that addiction, because if you act out,

12 you will be punished.  You've been punished already,

13 I think sufficiently punished, by what happened in

14 state court.

15    There was no physical harm to anybody.  There

16 was no -- there is no -- nothing in the record to

17 suggest that the children ever learned of this

18 occurrence.  There is nothing to suggest in the

19 record that you understood that the house was

20 inhabited by a woman and her children.

21    So it's, frankly, weird that you did this.

22 It's concerning that you did this, but I don't think

23 it calls for an additional period of incarceration.

24 In my view, a period of incarceration at this point

25 would only set you back.

1    You obviously have been somewhat unsuccessful

2  so far on supervised release, but the point is you've

3  got connections with an organization that's helping

4  you deal with your reentry.  You're making some

5  efforts to get your driver's license and so forth.

6  Those are all going to get set back if you go to

7  prison.

8    What I want to do is ensure that you are

9  determined to deal with your problems and make sure

10  that you don't harm anybody else.  I think the best

11  way to do that is to get you rehabilitated, not to

12  lock you up for a short period of time.  That's going

13  to do nothing except for those four months.

14    So in sum -- oh, I should also mention, I

15  think your time in state prison was extended because

16  of the federal detainer.  The federal detainer meant

17  you could not receive parole.  I assume you would

18  have received parole at some point.  So you have

19  received, in effect, some term of imprisonment as a

20  result of the bringing of the federal supervised

21  release charges.

22    What you need is mental health treatment, sex

23  offender treatment, and help getting a stable place

24  to live and, hopefully, a stable employment.

25    So, essentially, for those reasons I do not

intend to sentence you to further punishment for the violation that's been charged here.

I do think it's important to take up the modification of supervised release. It sounds like folks are ready to go forward today, so I'm happy to do that if people want to be heard on that question.

First off, let me hear if there is anybody who wants to have a further articulation of the reasons for not imposing an incarceratory sentence.

MS. KRULL: No, Your Honor.

MS. SILVER: No, Your Honor.

THE PROBATION OFFICER: No, Your Honor.

THE COURT: All right. Do you want to start, Ms. Silver?

MS. SILVER: Sure. Like I said, I don't -- there is a lot here that I don't think is particularly novel or dramatically changes his existing conditions. We spoke very briefly on the proposed modification, so I think we are aware where the -- there may be some sticking points. I don't want to harp on this since it's not applicable.

So we have no objections to the proposed conditions as outlined both by probation and in the government's memorandum to Condition 1, Condition 2 --

```
 1          THE COURT:  When you say "Condition 1" --
 2          MS. SILVER:  I'm sorry.  I'm referring to the
 3  government's.
 4          THE COURT:  These are the special conditions?
 5          MS. SILVER:  Yes.  Yes.
 6          THE COURT:  Not the mandatory or standard
 7  conditions?
 8          MS. SILVER:  No.  We are not at this time
 9  seeking modification to those conditions.
10          THE COURT:  All right.  Let me find out if
11  the government is seeking modification of either the
12  mandatory or standard conditions.
13          MS. KRULL:  No, Your Honor.
14          THE COURT:  Very well.  Did we -- did we.
15  Did the Court, that is, Judge Burns, impose Standard
16  Condition Number 12 which has been changed?  It's no
17  longer -- I have to go back and get an old book to
18  get the --
19          MS. KRULL:  Yes, Your Honor.  I see the
20  judgment.  It says, "The defendant shall not enter
21  into any agreement or act as an informer."  Is that
22  the one you're talking about?
23          THE COURT:  No.  Hold on.  Let me see.
24          Well, if that's Number 12 -- do you have the
25  judgment by any chance?
```

1    MS. KRULL:  Yes.  That's what I'm reading

2 from.  It's Docket Number 40 on the docket.

3    THE COURT:  And what is Number 12?

4    MS. KRULL:  Number 12 says, "The defendant

5 shall not enter into any agreement to act as an

6 informer or special agent of law enforcement agency

7 without the permission of the Court."

8    THE COURT:  Right.  I think that one is fine.

9 So they must have changed it before.  Okay.  I'm not

10 going to worry about that.

11    So you don't have any suggested changes to

12 either mandatory or standard conditions?

13    MS. KRULL:  No, Your Honor.

14    THE COURT:  All right.  Let's take up the

15 discretionary or special conditions.

16    So no objection to Number 1; is that right?

17    MS. SILVER:  No objection to Number 1 either

18 as outlined by probation or as proposed amended by

19 the government.  No objection to 1, 2 or 3.

20    THE COURT:  I haven't checked the consistency

21 of the probation office's recommendation and the

22 government's recommendation.  Are those the same?

23    MS. SILVER:  The government has proposed

24 additional clarifications in the memorandum to the

25 ones proposed by the probation office, I think in

part to bring them in line with some of the language
we're using now when we impose these.

THE COURT:  So you're -- when you say "no
objection to Number 2," you're talking about what the
government has proposed?

MS. SILVER:  Yes.

THE COURT:  That's fine.  Okay.

MS. SILVER:  Yes.  I'm going through the
government's brief as I do this.

THE COURT:  Very good.  So 1, 2 and 3, you
said, are all good?

MS. SILVER:  Yes.

THE COURT:  Okay.

MS. SILVER:  With respect to Condition 4,
this is not relevant to Mr. Van Wyk as he has no
children.  I do just want to note that in order for
there to be a restriction on contact with one's own
children, there does have to be a specific finding by
the Court.  Again, it's not applicable here because
he doesn't have children.  But if and when he has
children, we would seek to have that modified to
either reflect the finding that he is restricted from
having contact with his own child or we would seek a
modification or clarification of that.  I'm just
highlighting that.  It's not applicable here; he does

1   not have children.

2         THE COURT:  Yeah.  So you don't object to

3   Number 4?

4         MS. SILVER:  No.

5         THE COURT:  But you are going to move to

6   modify it in the event that he has -- becomes a

7   father?

8         MS. SILVER:  Yes.  We will reserve our rights

9   to modify on that one.

10        THE COURT:  All right.

11        MS. SILVER:  Six and 7, we have no objections

12  to the proposed modifications.

13        MS. KRULL:  You skipped 5.

14        MS. SILVER:  I'm sorry.  Five is fine.

15        With respect to --

16        THE COURT:  Let me go back to 5.

17        MS. SILVER:  Uh-huh.

18        THE COURT:  Ordinarily, I don't order a

19  search condition except a plain view, if evidence of

20  a violation of supervised release is in plain view.

21  This search condition is much broader than that and

22  includes a search of Mr. Van Wyk's person.

23        So let me hear from the government why a more

24  restrictive condition is appropriate here.

25        MS. KRULL:  Yes, Your Honor.  This

restriction has been approved by the Second Circuit,
I'll start with that.  And I'll give you an example
of why this kind of search is -- this kind of
condition is needed, and I'm going to give you an
example of a recent case that our office has.

Not the defendant, in a different case who
had this search condition in a sex trafficking case.
He had failed to register as a sex offender.  State
offenders went to his residence to arrest him on that
charge, and when they showed up, he had an iPhone in
his hand, and he was talking to his mother on the
iPhone.

Well, there was a condition saying that he
was not supposed to have any unmonitored devices, and
that device was not one of the ones that probation
knew about.  And based on that, there was a
reasonable suspicion that he had possession of at
least one device, if not more.

So after he went to court and got released on
bond for that offense, probation then went in and did
a search to find that iPhone.  And not only did they
find that iPhone, but they found, I believe, five or
six other devices hid in his bedroom, all of which
were not monitored by probation.

So that's an example of a reasonable

1  suspicion search that could happen under here, why we

2  need such a thing, because the defendant did do --

3  did commit his crime using the Internet when he

4  enticed a child to engage in sexually explicit

5  activity, also to use the Internet to extort that

6  child with threats to continue to do that conduct or

7  else he would expose her videos. And so this

8  conduct, he's actually using electronic devices. So

9  that's an example that reasonable suspicion could

10 cause a search.

11      And I want to point out, Your Honor, too,

12 that there was consultation with the U.S. Attorney's

13 Office about doing a warrant, but we didn't have

14 probable cause. There was no probable cause of a

15 crime. We didn't know that he was using the device

16 to engage in contacting a child. We only knew that

17 it was a violation of a condition. So that's a

18 reasonable suspicion that would fall under this.

19      THE COURT: Right. Okay. But what you've

20 described is a -- evidence of a violation in plain

21 view. They walk in, they see him on the iPhone,

22 so --

23      MS. KRULL: They did not though.

24      THE COURT: I thought you just said that.

25      MS. KRULL: Well, I'm saying that they later

1    got a video that said that.

2         THE COURT:  Yes.  Yes.

3         MS. KRULL:  I mean, what if it was a

4    confession?  Which he did confess.  What if they --

5    he told the police?

6         THE COURT:  Maybe you misunderstand my

7    concern.  What searching the person includes is when

8    the probation officer shows up, they can pat him

9    down, tell him to empty his pockets, tell him to

10   strip if they want to.  Why is that any of that

11   necessary?

12         MS. KRULL:  Because he's a danger to the

13   public, and he has very much established that danger.

14   And we're talking about reasonable suspicion here,

15   not based off of a hunch or a guess.

16         THE COURT:  Slow down.  Slow down.  If you

17   get reasonable suspicion, why do you need to search

18   his person?

19         MS. KRULL:  Because what if he has the phone

20   in his pockets, or what if he has it hidden somewhere

21   on his person.  That's the purpose of that:  It's not

22   in his bedroom; it's on his person.

23         I mean, if we want to include restrictions

24   that they can't do a strip search, that's fine.  I

25   don't think anybody is contemplating a strip search

1   so we can limit that.  We can put limitations in the

2   condition.

3           He's been deemed high risk by his sex

4   offender treatment program, the evaluation.  He is a

5   high-risk offender.  The only reason the government

6   is seeking such strict conditions is because he is

7   such a high risk to children that he has repeatedly

8   demonstrated in multiple ways:  in-person contact in

9   addition to contact over the Internet.  We don't ask

10  for this condition across the board.  It's because of

11  the specific nature of this defendant and his risk to

12  children.

13          MS. SILVER:  It's been my experience that the

14  U.S. attorney's office asks for this condition in

15  every case involving possession or production of

16  child pornography.  So I don't know if it's an

17  individual assessment.  And it's something we're,

18  generally, in my office required to agree to as part

19  of the plea agreement.  It's not something that we

20  have the opportunity to argue.  We do here.

21          I do want to just note, I did say we did not

22  have any objection.  This is one area we're kind of

23  toggling back and forth between the brief and the

24  judgment, may have been misleading.  The original

25  condition is reasonable suspicion for the presence of

sexually explicit materials involving minors, so it's
a little bit more narrow than the one that's being
proposed here.  And I wasn't -- I'm not sure what --
how these are supposed to be modified together, the
language that is quite being proposed.

        But the other thing I just want to flag is
that the reason that Mr. Van Wyk did not have an
initial reaction to this is because he is not
interested in trying to hide things from the
probation office.  The reason we know he was deemed
high risk is because he is going to sex offender
treatment.  He is meeting with probation when he's
supposed to.

        THE COURT:  All right.  Thank you.

        So where are we now?  Number 6, do you agree
to that?

        MS. SILVER:  Six is -- I don't think there is
a modification proposed and it's a state and local
federal requirement, there is no objections there.

        THE COURT:  Of course.  All right.

        MS. SILVER:  Number 7, this is the financial
records.

        THE COURT:  Yeah.  I -- go ahead.

        MS. SILVER:  I mean, it might be overly broad
here.  This is, again, not something that Mr. Van Wyk

feels like he is -- the hill he wants to die on,

again, because he is not interested in hiding things.

The proposed amendment by the government just adds a

little more clarification for the purpose, but ...

THE COURT:  Well, let me hear from the

government.  I don't see -- I mean, the financial

records condition is normally imposed in a case

involving restitution obligations or fine

obligations.  Why is it appropriate here?

MS. KRULL:  This is a condition that was

imposed by Judge Burns in 2012.

THE COURT:  Right.

MS. KRULL:  We are concurring with that only

-- as noted by counsel, only adding additional

language to expand on the purpose which is listed

there.  It goes hand in hand with some of the other

conditions here as an enforcement mechanism in order

to determine whether the defendant is lying to

probation about whether he purchased any software,

equipment or services designed to block or circumvent

computer monitoring software or purchase child

pornography or purchase access or to have contact

with minors, all of those things can be shown on

financial records.  Different types of things can be

purchased.  We've seen it.  I've seen it in

investigative cases where defendants actually have
purchased child pornography using their own bank
accounts.

        And here, in addition to that, which people
might say, well, he's not going to do that, that's
too obvious, it's the trying to get around the
monitoring software.  I mean, he is saying that he's
not going to do that, but we have seen in other cases
where defendants actually do that.

        And so one of the ways to try and monitor to
see if that has been done is to look at the financial
records to see his purchase history, to see if
there's anything suspicious about that, what he's
ordering on Amazon, if he's ordering any suspicious
software from certain sites where he can download it.
It's just to monitor whether or not he is abusing his
computer access.

        And I keep coming back to his high risk.

        THE COURT:  Yeah.

        MS. KRULL:  He used the computer to commit
his underlying crime.

        THE COURT:  But -- I agree.  And there ought
to be computer restrictions.  But the financial
restrictions don't add anything and they're
unbelievably intrusive.  Anybody with half a brain

could circumvent this condition, and what that leaves
you with is just completely going through all his
financial records which -- or the probation office
going through his financial records, which serves no
purpose. It's intrusive. It doesn't help you. He
is not going to -- he is not going to use a credit
card to buy this software.

MS. KRULL: I've seen it, Your Honor. It
happens. I've seen it.

THE COURT: Well, all right. I'm not going
to impose Number 7. In fact, I'm going to eliminate
the financial condition from the judgment. Thank
you.

What about 8?

MS. SILVER: Yes. This is one that I do view
as a significant change to his proposed conditions.
His original conditions that he shall not loiter
around playgrounds, schools or arcades or other
places where children under the age of 18 congregate
and the proposed conditions that he shall not be in
those areas, and you are -- shall avoid and are
prohibited from being in any location where children
under the age of 18 are likely to congregate.

We have issues with this condition with
almost all of our clients who are on supervised

release that are sex offenders.  It's very confusing
to people what is an area -- prohibiting someone from
being in an area where children are likely to
congregate can mean that you cannot walk outside your
house if there's a park.  And it's not even about
going to the park.  It's about just walking by it,
because you're required to avoid that.  You're
required to avoid a restaurant where children might
go.  You're required to avoid going to the mall or
the movies.  I mean, it's just a very vague
condition, and a lot of our clients really do
struggle to understand exactly what that means.  It
requires a lot of going back and forth with the
probation office.

         The language that we would propose in lieu of
that would be that the restriction that restricts
Mr. Van Wyk from being in places or -- primarily used
for children such as schoolyards, playgrounds and
arcades, which I think is really what this condition
is trying to get at.  He knows he can't go to a
playground, so that's not the question.  It's being
in an area where children are likely to congregate
versus being in an area that is primarily used by
children.

         THE COURT:  I would add schools to your list.

1          MS. SILVER:  Yes.  Schoolyards.  The example
2     I'm using, it comes from a case *United States v.*
3     *Dupes*, 513 F.3d 338, second circuit.  It's places
4     primarily used for children such as schoolyards,
5     playgrounds and arcades, so certainly schools would
6     be on that list.
7          THE COURT:  Any opposition to the proposed
8     amendment?
9          MS. KRULL:  Yes, Your Honor.  The proposed
10    modification here is based on current language used.
11    It's also to avoid any argument as to what loitering
12    means, because one person's loiter can be another
13    person's just walking by.  And I thought that that
14    language -- and I think that's the reason why it was
15    changed from the way it was used in 2012 to be more
16    specific and so the defendant would have more
17    guidance as to what he actually could and could not
18    do.
19         The other thing I want to make note for the
20    record, Your Honor, is that the defendant had a
21    similar condition in place in his Arizona case, and
22    he was violated because he went to one of those
23    specific places:  an arcade.  He tried to get a job
24    at an arcade where children congregated.  So this is
25    a very important --

```
 1              THE COURT:  When he was 24.

 2              MS. KRULL:  Correct.  And when he was

 3      convicted of sexually molesting several children in

 4      person when he worked for the Boys & Girls Club in

 5      Arizona.  And so I just want to note that for the

 6      record, that he has a history and that this condition

 7      is very important.

 8              THE COURT:  Okay.  Well, the proposed

 9      amendment deals with a loitering problem, doesn't it?

10              MS. KRULL:  I was trying to avoid the

11      vagueness of this term "loiter" by getting a more

12      specific --

13              THE COURT:  Yes.  She doesn't suggest using

14      the term "loiter," does she?

15              MS. KRULL:  No.

16              THE COURT:  Okay.  So the issue is whether

17      there should be greater clarification, not just about

18      loitering but also about where he is permitted to go.

19      "Where children congregate" is not helpful.  Children

20      congregate many, many, many places.  So I think the

21      better way to go is to adopt the proposed edits to

22      the condition.

23              MS. KRULL:  Understood, Your Honor.

24              THE COURT:  All right.  Number 9, I assume no

25      objection.
```

          MS. SILVER:  No objection.  I'm sorry.  I'm

just --

          THE COURT:  I assume no objection to 10?

          MS. SILVER:  Let me just pull up the judgment

again.

          No.  No, of course not.

          THE COURT:  No objection to 11?

          MS. SILVER:  No.  The one thing I just wanted

to make sure that I understood, and maybe this is

where Officer Gorton might provide some guidance, is

what it means for probation to supervise here the

implication of mental health treatment.  The reason I

am flagging this is because often in cases where

there is sex offender treatment specifically, it's

very clear that that's about risk management and that

the probation officer will have, essentially, full

access into the records.

          And with mental health treatment, it is more

for the benefit of the individual, and having the

probation officer have full view of what someone

tells their therapist can be detrimental to actually

receiving the benefit of the mental health treatment.

          THE COURT:  Well, I don't understand that

there is going to be a recording of what Mr. Van Wyk

tells his therapist.  I mean, what they're talking

about is having access to did he attend therapy as he
was required to, is he going to an approved therapist
or some quack.

MS. SILVER:  Those things we have no
objection to the probation office having insight.
It's been my experience that this can sometimes mean
that the probation officer receives the treatment
notes which would include disclosures about childhood
trauma, about thoughts that they might be having that
they should be discussing in therapy; that's the
place to bring it out.  But when you get those
treatment notes are given to the probation officer,
it -- that is what I'm talking about as being the
barrier here.

In terms of going and attending and that it's
going to a person that's approved, there is no
objection there.

THE PROBATION OFFICER:  Your Honor, good
morning.  I think the terminology "treatment note"
has somewhat gotten confused and in a variety -- in
both realms, in both sex-offense-specific treatment
and mental health treatment.

So our provider, unfortunately -- our
sex-offense-specific provider calls an update
"treatment notes."  And what's that about is

1    risk-related discussions during a person's treatment,

2    you know, certain risk factors relative to that.  But

3    it's not an all-encompassing full, you know,

4    disclosure of what the person said in treatment.

5    It's relative to their risk.  So that's what happens

6    in sex-offense-specific treatment.

7            Mental health treatment in Mr. Van Wyk's case

8    would assist him with various mental health symptoms.

9    It would encompass us receiving information about the

10   clinician, whether or not they're valid to practice

11   in Connecticut, information about Mr. Van Wyk's

12   diagnosis, his treatment goals.  And that's the

13   extent of it unless there was some sort of

14   third-party risk concern or some concern for his own

15   safety.

16           So that's what the purpose of mental health

17   treatment is in this type of case.  It does involve

18   collaboration between the two therapists to help.  We

19   want to help Mr. Van Wyk so that his clinician is not

20   suggesting something that might be problematic to

21   others.

22           THE COURT:  I get the need.  The question is

23   what access you'll have if you're supervising the

24   mental health treatment.  Does that mean you get the

25   substance of what he's telling his therapist?

1    THE PROBATION OFFICER:  No, Your Honor.  We

2    receive treatment diagnosis, treatment goals and

3    prognosis and treatment.

4         THE COURT:  Okay.  We can make that part of

5    the condition.

6         MS. SILVER:  And to the extent that we have

7    any issues, that might be something that we seek to

8    modify at a later date.  It's a little premature at

9    this point.

10        THE COURT:  All right.  I have a problem with

11   Number 12, so let me hear from the government or

12   probation why that's necessary.

13        MS. KRULL:  Your Honor, is there a particular

14   part of it?  Is it the time frame, is it at all --

15        THE COURT:  It's the location monitoring.

16        MS. KRULL:  Just in general?

17        THE COURT:  Yeah.  I mean, in other words,

18   how does that -- how does that help either

19   rehabilitation or protection of the public?

20        MS. KRULL:  For example, Your Honor, it would

21   help protection of the public so that the probation

22   officer can know if the defendant is actually

23   violating these conditions, in particular if he is

24   going to a playground, if he is going to an arcade.

25   The GPS monitoring can determine that, and that will

1   aid in protecting the public.

2         It will also aid in his rehabilitation

3   because then probation can have those conversations

4   with the treatment provider and with the defendant

5   himself.  Given the nature of the underlying crime

6   and his violations recently, including the fact, you

7   know, we've been talking about the underlying crime

8   but we -- I mean, the recent violation crime.

9         But, also, I don't want it to be lost that he

10  was basically kicked out of the Drapelick Center and

11  banned from ever returning because -- and that was

12  just recently in August.

13        THE COURT:  And you knew where he was at that

14  time, so location monitoring would not have helped

15  that problem.

16        MS. KRULL:  Because he was in that -- but

17  he's not going to be in that forever.

18        THE COURT:  Of course.  But my point is, he

19  did that when you knew where he was.  So if you know

20  he's in his home, how does that help you?  Or you

21  know he's gone to the grocery store, or you know

22  he's, whatever, going to work, how does that -- how

23  does knowing where he is promote the safety of the

24  public?  It doesn't.  You're making guesses.

25        MS. KRULL:  I don't know how else to say it

1    other than if he goes to a prohibited place, then

2    probation will know.  You're assuming that he's going

3    to places that are not problematic, but we don't

4    know.  That's the whole purpose of GPS monitoring, to

5    make sure -- and it's a limited period.  It's only

6    six months.  It's not for the entire term or two

7    years.  It's to make sure that the public is

8    protected because of his high risk to the community,

9    that he's not going to those prohibited places that

10   he has gone to in the past.

11          THE COURT:  Yeah.

12          MS. KRULL:  And so, I mean, we're assuming

13   that he is going to be perfect on supervision when we

14   know just recently last year he was violating and he

15   wasn't perfect, and I don't think that's a fair

16   assumption to make.

17          THE COURT:  I am making no assumption that he

18   is going to be perfect.  If he were to be perfect, he

19   would be the first sex offender who has started his

20   rehabilitation and is perfect.  It's not going to

21   happen.  He's not going to be perfect.

22          But the point is, location monitoring is

23   extremely intrusive, it's expensive and it doesn't

24   help.  It does not help.

25          MS. KRULL:  It helps to know where he is so

that he's not abusing a child like he has in the
past.  He has physically touched, molested children
in the past.

THE COURT:  And if he's in his home abusing a
child, it will not trigger.  There will be no way for
the GPS to say, hey.

What you want is you want a video.  You want
him to walk around with a video so you know he's not
molesting a child here, he's not molesting a child
there.  The GPS is not going to tell you anything
that's helpful to that.  He is not going to molest a
child at a playground.

MS. KRULL:  Excuse me?  Yes, he might.  He's
a high risk.  He molested a child not at home last
time.  He molested children at the Boys & Girls Club
and at a daycare.

THE COURT:  Inside a buildings -- inside
buildings.

MS. KRULL:  An arcade is a building.

THE COURT:  Yes, it is.

MS. KRULL:  And it would be very helpful to
know, via GPS, if he is going to an arcade like he
has in the past.

THE COURT:  All right.  I understand.

I'm not going to impose Number 12.

1          All right.  Any others that you suggest?

2          MS. SILVER:  We have nothing further.

3          THE COURT:  So let me ask that probation

4   prepare -- or we can prepare an order, it doesn't

5   matter, but --

6          THE PROBATION OFFICER:  Your Honor, I can

7   prepare the judgment.

8          THE COURT:  All right.  Let me ask you to

9   confer with both counsel and submit it after you've

10  done that so that I understand if there is agreement

11  or not on the proposal that you --

12         THE PROBATION OFFICER:  Yes, Your Honor.

13         THE COURT:  Thank you.  All right.

14         So just to be clear, the judgment on the

15  violation will not include any additional punishment.

16  The state has adequately punished Mr. Van Wyk for the

17  conduct giving rise to the state offense which is the

18  only basis for the federal violation charge; however,

19  we are going separately monitor -- excuse me, modify

20  the supervised release conditions to reflect the

21  discussion that we have just had.

22         Let me hear from either counsel if there is

23  any reason why that sentence cannot lawfully be

24  imposed.

25         MS. KRULL:  No objection, Your Honor.

1    Nothing.

2         MS. SILVER:  No.  No objection, Your Honor.

3         THE COURT:  All right.  Mr. Van Wyk, the

4    judgment I've just described is imposed as the

5    judgment regarding your supervised release violation.

6    You have the right to appeal if you choose to.  You

7    have to file a notice of appeal within 14 days.

8         Do you understand that time limit?

9         THE DEFENDANT:  Yes, sir.

10        THE COURT:  If you wish to appeal but you

11   cannot afford to do so, you can file a motion to

12   proceed in forma pauperis.  If that motion is

13   granted, the Court will waive the filing fee for your

14   appeal and will appoint a lawyer to handle your

15   appeal at no cost to you.

16        Do you understand?

17        THE DEFENDANT:  Yes, sir.

18        THE COURT:  So let me just be clear.  You

19   need to get your act together.  You need to figure

20   out what your triggers are, you need to avoid that,

21   those things.  You need to figure out how best to get

22   back to being a productive person in our society.

23   You've got a lifetime of supervised release.  As

24   you've heard today, those conditions of supervised

25   release can be very onerous.

So if you want the rest of your life to be
subject to onerous conditions, just keep acting out.
If you want to go back to prison for violating your
supervised release, just keep acting out. We can
send you back there real quick. There is no jury
trial right, no right to confront witnesses, no proof
beyond a reasonable doubt requirement. It is
amazingly easy to send people to prison for violating
supervised release.

Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: Yeah. It could be done in a
matter of days. So you've got choices ahead of you.
You can do the hard work to get yourself together,
deal with your mental health problems, deal with your
sex offender problems, and have some hope for a
future life.

Or you can -- you heard the prosecutor,
right? You can keep doing what you're doing, and
you'll be prosecuted either for a violation or for
violation of law. A violation of supervised release
is easy. A violation of law is harder. But there
you go.

Am I getting through to you?

THE DEFENDANT: Yes, sir, you are.

```
1          THE COURT:  Work with Ms. Silver.  I hope you

2    find some housing.  I hope you find a job and I wish

3    you good luck.  Stay out of trouble, sir.

4          THE DEFENDANT:  Thank you.

5          THE COURT:  We'll stand in recess.

6          (PROCEEDINGS ADJOURNED, 11:02 a.m.)

7

8                C E R T I F I C A T E

9

10   RE: UNITED STATES OF AMERICA v. WILLIAM SCOTT VAN WYK
                 No. 3:11-cr-00213-SRU-1
11

12          I hereby certify that the within and

13   foregoing is a true and accurate transcript taken in

14   the aforementioned matter to the best of my skill and

15   ability.

16

17        /s/_Melissa J. Cianciullo_____

18        MELISSA J. CIANCIULLO, RDR, CRR, CRC
                 Official Court Reporter
19            United States District Court
                 915 Lafayette Boulevard
20               Bridgeport, CT 06604
                   (203) 606-1794
21

22

23

24

25
```